Filed 3/11/26  P. v. Gonzalez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON LASHON GONZALEZ,<br><br>    Defendant and Appellant. | F088497<br><br>(Super. Ct. No. F16906864)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Francine Zepeda, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Jason Lashon Gonzalez guilty of five counts of sodomy against a child under the age of 10 in violation of Penal Code section 288.7, subdivision

(a)[1] and one count of committing a lewd act against a child in violation of section 288, subdivision (a).  Defendant was sentenced to a total term of 100 years to life.  On appeal, defendant argues:  (1) the trial court prejudicially erred by permitting expert testimony regarding child sexual abuse accommodation syndrome (CSAAS); (2) the court prejudicially erred by giving CALCRIM No. 1193 (CSAAS testimony) and CALCRIM No. 332 (expert testimony) and by failing to give CALCRIM No. 303 (evidence for a limited purpose); (3) defense counsel was constitutionally ineffective for his treatment of CSAAS issues; (4) substantial evidence does not support the count 1 conviction for sodomy against a child under 10 years old; and (5) he is entitled to additional custody and conduct credits.  We affirm defendant's convictions and sentence but conclude that defendant is entitled to additional custody credits.

## PROCEDURAL BACKGROUND

On November 9, 2023, the Fresno County District Attorney filed an amended information that charged defendant with five counts (counts 1 through 5) of sodomy of a child 10 years old or younger (§ 288.7, subd. (a)), and one count (count 6) of committing a lewd act on a child (§ 288, subd. (a)).  All counts were alleged to have occurred "[o]n or about August 1, 2007 through June 30, 2012."  Counts 2 through 5 were all alleged to have occurred in Parlier.  Count 1, however, was described as the "first time in the city of Reedley when victim was 4 or 5 years old."  All counts involved conduct against a single victim, E.

On June 4, 2024, a jury trial began.  Trial concluded on June 10, 2024.  A jury found defendant guilty on all six counts.

On August 13, 2024, the trial court imposed a total sentence of 100 years to life. The court sentenced defendant to 25 years to life for each of the five counts of sodomy, with count 4 running concurrently with count 3, and counts 1, 2, 3 and 5 running

---

[1]     All further statutory references are to the Penal Code.

2.

consecutively. The court sentenced defendant to the middle term of six years on count 6 but stayed that term pursuant to section 654. Defendant was awarded credit for 1,402 days of actual custody and 210 days of conduct credit under section 2933.1.

Appellant timely appealed.

## FACTUAL BACKGROUND

E. was born in January 2003. E. has one younger brother and one older sister, and her mother is R.L. Defendant was born in February 1986. Defendant came into E.'s life when she was around four or five years old. Defendant first lived in R.L.'s garage in 2007, but it was not long before he moved into the home and began having a relationship with her. Defendant and R.L. had a son together in May 2009, when E. was six years old. After moving from Reedley, to Parlier, and to Orange Cove, it appears defendant and R.L.'s relationship ended, and defendant moved away from E. and her family. R.L. and defendant's relationship lasted for about seven years. Defendant's relationship with R.L. was tumultuous and marked with abuse and drug use. However, during R.L. and defendant's relationship, E. viewed defendant as her stepdad and like a father figure. The last time E. saw defendant was when she was in the sixth grade.

On September 28, 2015, when she was in the seventh grade, E. went to a school counselor, Antonio Valdez. R.L. arranged for E. to see Valdez because E. was engaged in non-suicidal self-injury. E. eventually broke down in tears and told Valdez that she had experienced sexual abuse, but she did not go into specific details. Valdez contacted Child Protective Services (CPS) and R.L. The CPS worker told R.L. that they could not coerce E. into going to the police and that they had to wait until E. was ready to go herself.

In December 2015, E. was ready to speak to the police. The Reedley Police Department arranged for E. to have a multidisciplinary interview center (MDIC)

3.

interview.[2] On December 22, 2015, a professional interviewer conducted a video-recorded MDIC interview with E. A Reedley police officer was watching and listening to the interview as it was happening. The video of E.'s MDIC interview was played to the jury and a transcript was prepared.

In part, E. told the interviewer that defendant had sexually abused her more than 10 times. E. said that the first time she remembered being abused was when she was four or five years old. E. believed she was still going to preschool because her mother was working, and her older sister was going to school. E., her sister, her mother, and defendant were living together in a house in Reedley on Hemlock Street. E. thought that her little brother had been born but was still just a baby. E. told the interviewer that she was lying on her back in her mother's bed in the afternoon when defendant walked into the bedroom. R.L. was working and E.'s sister was in school. Defendant told E. to pull her pants down, and E. complied. E. wrote on a piece of paper that defendant did things to her that were inappropriate. E. then told the interviewer that defendant pulled down her shorts and underwear and had her lay on her stomach. E. explained that defendant pulled down his pants, put his private parts inside of her "butt," and moved up and down. E. testified that what defendant was doing felt "weird" and hurt her "butt." When E. tried to get up, defendant pushed her back down, so she stayed lying down. After defendant stopped, he told E. not to tell anyone what had happened. E. said that she did not tell anyone about this initial abuse because she was scared. E. continued to describe similar acts of sodomy occurring when she was older and living in Parlier. E. also wrote out instances when defendant touched her breasts while rubbing her back when she was seven or eight years old. E. told the interviewer that she did not tell her mom about any sexual abuse in part because she was scared that her mom would be mad at her for not

---

[2]     The MDIC is a "facility specially designed and staffed for interviewing children suspected of being victims of abuse." (*People v. Sisavath* (2004) 118 Cal.App.4th 1396, 1400.)

4.

telling sooner. E. also described an instance in which her aunt asked about inappropriate touching, but E. told her aunt that nothing was happening because she was afraid her aunt would be mad. E. also described an instance in which CPS was in their home on a domestic violence matter. CPS asked E. and her older sister if there was any inappropriate touching going on, and both answered no. E. explained that she was afraid she would be taken away from her mom if she answered yes. Finally, E. told the interviewer that there were other things that defendant had done but she was not ready to discuss them.

Apparently after additional investigation, a felony complaint was filed against defendant on November 21, 2016, for sexual abuse against E.

*Trial Testimony of E.*

At trial, E. (who was then 21 years old) testified in part that she saw and heard defendant physically and verbally abuse R.L. E. testified that she did not like what defendant was doing to her mom, but she still loved and cared about him. E. also saw that defendant was strong, and his strength and his abuse of her mom made E. scared that defendant would ultimately kill R.L. or do something to the family.

With respect to disclosing defendant's sexual abuse, E. testified she saw her seventh grade school counselor, Valdez, because her mother had found out that she was cutting herself. During her conversation with Valdez, he asked E. if anyone was hurting her. E. told him yes, but that it was not happening at that time and had only happened in the past. E. told Valdez that it had happened when she was younger, that it was somebody she knew and was close to, and that it was her younger brother's dad. E. told Valdez that defendant had raped her, which she understood to mean that he touched and penetrated her inappropriately and without her consent. Valdez asked E. if she had told her mom, and when she answered no, he said that he would have to tell her mom and CPS. E. felt scared about telling her mom and, although she did not want to tell Valdez, it was easier to tell him because he had asked her first. E. was scared and was unable to

5.

tell her mom, so Valdez did so. After Valdez told R.L. about what E. had disclosed, R.L. told E. that they would go to the police whenever she (E.) was ready. Eventually E. felt ready to see the police, and in the interim, she told her immediate family, grandparents, and aunts and uncles about some of the abuse. When E. went to the police, she was uncomfortable about telling them what happened, so she did not disclose everything. However, when she spoke to the MDIC interviewer, she disclosed more details about defendant's abuse. E. testified that to this day, she has still not told her sister or mother all the details of the abuse.

With respect to the sexual abuse by defendant, E. testified she was abused by defendant frequently, perhaps once a day and almost anytime that R.L. was not home. However, the abuse stopped after defendant and R.L. broke up. E. explained that there were certain things that she remembered, but she believed that there were lots of things she had blocked out because they were so traumatic. E. estimated that defendant had sodomized her probably "well over 20 times."

In the course of her testimony, E. described several acts of sodomy by defendant. E.'s trial testimony and description of the abuse and sodomy perpetrated by defendant were generally consistent with her MDIC interview. In general, E. and defendant would be in a room and R.L. would not be present. E. would be on her stomach, and defendant would remove E.'s pants and sodomize her. Only one time did defendant tell E. not to tell her mom. At other times, E. testified that she did not say anything about the abuse because she did not know it was wrong, she was close to defendant, and she looked at him as a kind of father figure.

The first act of sodomy/abuse that E. testified she recalled was when she was seven or eight years old and living in Parlier. However, E. testified that she did not recall telling police officers or the MDIC interviewer about any abuse in Reedley when she was four or five years old. The prosecutor showed E. a paper that she had written during the MDIC interview, but although E. recognized the handwriting as her own, the writing did

6.

not help E. to remember "what happened in Reedley." E. then read an officer's statement in an effort to refresh her recollection, but she was still unable to remember what abuse occurred in Reedley or what she told officers or the interviewer about Reedley.

*Trial Testimony of Jason Christopherson*

Jason Christopherson, Ph.D, testified as an expert in CSAAS, which attempts to explain the behavior of children who are the victims of sexual abuse. Dr. Christopherson testified that he had not been provided with any reports in this case and did not know anything about the case. Dr. Christopherson explained that CSAAS is not a diagnostic tool or a tool used to prove something, rather it is a way of understanding the psychological and developmental issues that children go through and how that development affects a child's response to being a sexual abuse victim.

Dr. Christopherson testified that CSAAS recognizes five major behaviors that victimized children commonly manifest: secrecy, helplessness, entrapment accommodation, unconvincing disclosure, and recanted disclosure. Dr. Christopherson testified that the list is not intended to be a checklist or understood to mean that all victims will exhibit each behavior; a child may exhibit some or all five of the behaviors. Dr. Christopherson described each of the five CSAAS behaviors. With respect to secrecy, Dr. Christopherson testified that children may keep secrets for months, years, or decades because of a special or family relationship with the abuser, they are afraid of getting in trouble, they may be responding to threats by the abuser, or they are naturally uncomfortable talking about sexual abuse. With respect to helplessness, children may feel "stuck" because they fear "bad things happening, getting in trouble, or losing a special relationship, or they feel conflicted because there may be an element of pleasure from the abuse that creates a mixed experience. With respect to entrapment accommodation, because children may feel stuck and afraid that they or the abuser could get in trouble, children sometimes seek out the abuser, have interactions with the abuser, attempt to protect their relationship with the abuser, or do not disclose the abuse. As a

method of accommodation, children may also engage in disassociation, in which the child essentially blocks out or does not remember traumatic experiences like sexual abuse. With respect to unconvincing disclosures, Dr. Christopherson explained that disassociation may cause a child victim to forget details, mix up details, or combine multiple events into a single event. Some children may also engage in incremental disclosure by disclosing little details over time or to different people, while other children may disclose all of the abuse to a single person all at once. With respect to recanting disclosures, sometimes children see their lives being entirely changed and, in an effort to return to how things used to be, recant or retract their disclosures. On cross-examination, Dr. Christopherson testified in part that non-sexual traumas, such as being neglected due to parental substance abuse, may cause a child to exhibit any of the five CSAAS behaviors.

## DISCUSSION

### I. PROPRIETY OF CSAAS EXPERT EVIDENCE

#### A. Parties' Arguments

Defendant argues the trial court erroneously admitted Dr. Christopherson's CSAAS evidence for several reasons. First, defendant argues that the "myths" that CSAAS seeks to dispel are now readily understood by the public in light of recent sex abuse scandals. Second, defendant argues that other jurisdictions recognize that CSAAS evidence is inadmissible and unreliable. Third, defendant argues that CSAAS is rebuttal evidence and that there was nothing to rebut from E.'s testimony because she testified to the elements of the charges and defense counsel never questioned or attacked E.'s credibility. Finally, defendant argues that Dr. Christopherson's testimony was too contradictory and confusing to be considered relevant evidence. Defendant argues that admission of the irrelevant CSAAS evidence violated his due process rights and was prejudicial under any standard. Defendant also argues that the issue has not been

forfeited because defense counsel objected to Dr. Christopherson's testimony in opposition to the prosecutor's motion in limine.

The People contend in part that Dr. Christopherson's CSAAS testimony was relevant and properly admitted. The People argue that defendant's arguments regarding the public's understanding of a child's reaction to sexual abuse, as well as his reliance on out of state authority, are foreclosed by recent California authority. The People also argue that the CSAAS evidence was relevant and admissible because E.'s testimony implicated multiple myths/behaviors that are addressed by CSAAS.

### B.    Additional Background

As part of her motions in limine, the prosecutor moved to admit expert testimony regarding misconceptions about the five CSAAS behaviors of children. Defense counsel objected that until E. testified, it was unclear whether CSAAS evidence would have any relevance. Defense counsel explained:

> "If there is evidence that the complaining witness comes up and states this never happened or I lied or any of those things which would not go to or which would go against the veracity of her claim, then a CSAAS expert may become appropriate. But if she comes and testifies and basically lists off the elements of these charges, putting up a CSAAS expert, all that does is vouch for her and vouch for the jury and say not only did she say this happened, but, look, we have an expert who says this happened. It doesn't add anything if there isn't inconsistencies or anything of that nature.

> "So at this moment it is irrelevant in that we don't know. If there is major changes or major issues with her testimony, then obviously my argument would be extremely different a day from now."

The trial court took the CSAAS motion in limine under advisement until after E. testified.

After E. and R.L. testified, the trial court returned to the issue of CSAAS testimony. The court simply stated that it was "going to allow the CSAAS." Defense counsel made no objections to the court's ruling and did not object during Dr. Christopherson's testimony.

9.

*C. Legal Standards*

*1. <u>Expert Testimony Generally</u>*

An expert witness may express opinions on any "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *People v. Valencia* (2021) 11 Cal.5th 818, 831.) Further, because it is part of an expert's specialized knowledge, experts may inform the jury about background information generally accepted and reasonably relied on in their field. (*People v. Turner* (2020) 10 Cal.5th 786, 821, fn. 20.) Trial courts have broad discretion in deciding whether to admit or exclude expert testimony, and their admissibility decisions are reviewed for an abuse of discretion. (*People v. Duong* (2020) 10 Cal.5th 36, 60; see *People v. Hin* (2025) 17 Cal.5th 401, 484.) A trial court may abuse its discretion when it acts in an arbitrary, capricious, or absurd manner that results in a miscarriage of justice (*People v. Miles* (2020) 9 Cal.5th 513, 587) or when its ruling is outside the bounds of reason under the circumstances (*People v. Johnson* (2022) 12 Cal.5th 544, 605). " 'A merely debatable ruling cannot be deemed an abuse of discretion.' " (*Ibid.*)

*2. <u>CSAAS Expert Testimony</u>*

Expert CSAAS testimony is generally admitted to " 'disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301; *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*); see *People v. Flores* (2024) 101 Cal.App.5th 438, 455–456 (*Flores*).)[3] Therefore, "[w]hen a

---

[3]    Defendant's citation to out of state authority for the proposition that CSAAS evidence is unreliable or an improper way to bolster the testimony of a child witness is unpersuasive. As demonstrated by these citations, our Supreme Court and numerous California appellate courts have held that CSAAS testimony is admissible. Accordingly, we follow *McAlpin* and its progeny and will not reexamine the issue.

victim's credibility is placed at issue due to 'paradoxical behavior, including a delay in reporting,' CSAAS testimony is admissible to disabuse a jury of misconceptions about how a child reacts to molestation." (*Flores*, *supra*, at p. 456; see *People v. Page* (2025) 114 Cal.App.5th 1022, 1027, fn. 2 (*Page*); *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*).) Stated differently, expert CSAAS evidence may be introduced "if the issue of a specific misconception is suggested by the evidence." (*Patino*, *supra*, at p. 1745.) However, expert testimony regarding CSAAS may not be admitted to prove that a complaining witness has been sexually abused, nor may a CSAAS expert witness opine about the veracity of a complaining witness. (See *McAlpin*, *supra*, at p. 1300; *Munch*, *supra*, at p. 468.) Thus, "[w]hile CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established [that] CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) Reviewing courts routinely hold that the admission of CSAAS evidence in compliance with the rules of evidence does not violate a defendant's due process rights. (See *id.* at p. 174; *Patino*, at p. 1747.)

### D. Analysis

#### 1. Forfeiture

In some circumstances, an appellant's objection as part of a motion in limine and a court's ruling thereon may be sufficient to preserve an issue for appeal without further objections during trial. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1108–1109; *People v. Morris* (1991) 53 Cal.3d 152, 190 (*Morris*), disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) However, for an issue to be preserved based only on in limine proceedings, there must be, among other things, an express ruling from the trial court (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171), and the ruling must have been made at a time when the trial judge was able to determine the evidentiary question in its appropriate context. (*Morris*, *supra*, at p. 190.)

11.

Here, the trial court did not make any express rulings with respect to Dr. Christopherson during the motions in limine hearing. Defense counsel objected to the admission of Dr. Christopherson's testimony on relevancy grounds because it was unknown precisely what E.'s testimony would be. The trial court agreed with defense counsel because it took the matter under advisement until after E. testified. Thus, no ruling was made at the motions in limine hearing because the trial court was not in a position to assess the relevancy of Dr. Christopherson's testimony without first hearing E.'s testimony. Under such circumstances, defense counsel's in limine objection did not preserve errors with respect to Dr. Christopherson. (*People v. Ramos*, *supra*, 15 Cal.4th at p. 1171; *Morris*, *supra*, 53 Cal.3d at p. 190.)

In order for defendant to have preserved issues relating to Dr. Christopherson, he was obligated to object and explain why Dr. Christopherson's testimony was irrelevant in light of E.'s actual trial testimony and too vague. (Evid. Code, § 353; *Morris*, *supra*, 53 Cal.3d at p. 190; see *People v. Danielson* (1992) 3 Cal.4th 691, 729.) Defendant made no such objections. Therefore, defendant has forfeited his vagueness and relevancy objections to Dr. Christopherson's testimony. (Evid. Code, § 353; *Danielson*, *supra*, at p. 729; *Morris*, *supra*, at p. 190.)

### 2. *Relevancy of Dr. Christopherson's Testimony*

Alternatively, even if defendant did not forfeit his relevancy objection, Dr. Christopherson's testimony was relevant and admissible because the evidence demonstrated that E. exhibited four of the five CSAAS behaviors.[4] (*Page*, *supra*, 114

---

[4] Similarly, even if defendant did not forfeit his vagueness objection, the objection is without merit. Dr. Christopherson's testimony was clear and typical CSAAS expert testimony. (E.g. *People v. Ramirez* (2023) 98 Cal.App.5th 175, 214–215; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171; *Munch*, *supra*, 52 Cal.App.5th at p. 467; *Patino*, *supra*, 26 Cal.App.4th at p. 1742.)

Cal.App.5th at p. 1027, fn. 2; *Flores*, *supra*, 101 Cal.App.5th at p. 456; *Patino*, *supra*, 26 Cal.App.4th at p. 1745.)

First, with respect to secrecy, Dr. Christopherson testified in part that children may keep the secret of sexual abuse for months, years, or decades because of a special relationship with the abuser, a fear of getting into trouble, and natural discomfort over speaking about sexual abuse. Consistent with this testimony, E. did not disclose for years any abuse and did not disclose the abuse until months after it had ended. When she finally did disclose to Valdez, she did not go into detail and was too afraid to tell her mom; Valdez had to disclose to R.L. E. also testified that she did not tell the police in December 2015 everything that defendant had done to her and, as of trial, she still had not told her family everything that defendant did. E. also testified that she was afraid of what defendant could do to her mother and to herself if she disclosed and yet at times she still loved and cared for defendant and viewed him as a father figure. Further, E. explained to the MDIC interviewer that she told her aunt and a CPS officer that she was not being abused by defendant, even though she was directly asked about inappropriate touching, because she did not want her aunt to be mad and did not want CPS to take her away from her mom. Finally, E. said during her MDIC interview that she was tired of talking about the abuse and that there were other things that defendant had done to her that she was unwilling to discuss.

Second, with respect to helplessness, Dr. Christopherson testified in part that children may feel stuck in an abusive situation in part because they fear getting into trouble, losing a special relationship, or are afraid of bad things happening. Consistent with this explanation, again, E. testified she was afraid of defendant doing bad things to her family and told the MDIC interviewer that she was afraid of getting in trouble or losing her relationship with her mother if she disclosed the abuse.

Third, Dr. Christopherson testified in part about the disassociation aspect of entrapment accommodation. Dr. Christopherson explained that as a method of

13.

accommodation, children may utilize disassociation and block out or forget the traumatic experiences of sexual abuse. Consistent with this explanation, E. testified that she could not remember all of the episodes of sexual abuse, even though they were very common, and expressly stated that she had blocked out the memories of abuse because they were so traumatic. Further, E. testified that she had no recollection of any abuse occurring in Reedley, despite two attempts to refresh her recollection and even though E. had told the MDIC interviewer in December 2015 that the first act of abuse occurred in Reedley when she was four or five years old.

Fourth, and finally, Dr. Christopherson testified in part about the disassociation and incremental disclosure aspects of unconvincing disclosures. Dr. Christopherson testified that disassociation may cause some children to forget or "mix up" details, while incremental disclosure may cause some children to disclose some details over a period of time and to different people. The evidence and E.'s testimony are consistent with both of these aspects of unconvincing disclosure. E. testified to forgetting details about the episodes of abuse, blocking out many of the episodes, and entirely forgetting the first disclosed act of sexual abuse against her. Further, the evidence demonstrated that E. revealed some of the abuse to Valdez, then some to her family, then some to the police, and then more to the MDIC interviewer, but she had not fully disclosed all that defendant had done to her.

We recognize that defense counsel's cross-examination of E. was relatively brief and, although counsel asked E. about a timeline of disclosures, she did not confront E. with any express inconsistencies in her testimony. Nevertheless, CSAAS evidence may become relevant and admissible when the admitted evidence demonstrates paradoxical behavior by the victim that may be explained by CSAAS. (*Page*, *supra*, 114 Cal.App.5th at p. 1027, fn. 2; *Flores*, *supra*, 101 Cal.App.5th at p. 456; *Patino*, *supra*, 26 Cal.App.4th at p. 1745; see also *Lapenias*, *supra*, 67 Cal.App.5th at p. 172.) As recounted above, E.'s testimony and other evidence revealed behavior by E. that could be explained by four

14.

CSAAS behaviors. In fact, during closing argument, defense counsel acknowledged that "[E.]'s actions as a 12-year-old were consistent with CSAAS." Because E.'s testimony and other evidence clearly implicated four of the five CSAAS behaviors, Dr. Christopherson's testimony was admissible to disabuse the jury of any misconceptions that they may have harbored regarding how children react to sexual molestation. (*Page*, *supra*, at p. 1027, fn. 2; *Flores*, *supra*, at p. 456; *Patino*, *supra*, at p. 1745; see *Lapenias*, *supra,* at p. 172.) Therefore, the trial court did not abuse its discretion by admitting Dr. Christopherson's testimony (*People v. Johnson*, *supra*, 12 Cal.5th at p. 605; *People v. Duong*, *supra*, 10 Cal.5th at p. 60; *People v. Miles*, *supra*, 9 Cal.5th at p. 587), and defendant's due process rights were not violated. (*Lapenias*, *supra*, at p. 174; *Patino*, *supra,* at p. 1747.)

II.   INSTRUCTIONS RELATING TO CSAAS

   *A.     Parties' Arguments*

Defendant argues that there is cumulative prejudicial instructional error because the trial court improperly instructed the jury with CALCRIM No. 332 (expert witnesses) and CALCRIM No. 1193 (CSAAS evidence) but without instructing with CALCRIM No. 303 (limited purpose evidence). With respect to CALCRIM No. 303, defendant argues that CALCRIM No. 1193 does not sufficiently inform the jury that CSAAS evidence is limited purpose evidence and the bench notes for CALCRIM No. 1193 direct the court to give CALCRIM No. 303. Second, Defendant contends that CALCRIM No. 332 and CALCRIM No. 1193 together are confusing and permit a jury to consider hypothetical questions that are too close to the facts of the case. Defendant also argues that CALCRIM No. 332 tells the jury they must consider an expert's opinion, but CALCRIM No. 1193 does not use the word opinion. Further, defendant argues that CALCRIM No. 332 requires the jury to consider assumed facts within an opinion without giving the jury a basis to consider the truth of CSAAS. Third, and finally, defendant argues that CALCRIM No. 1193 is contrary to law because it tells the jury to consider

15.

whether a victim's testimony "was consistent" with CSAAS, as opposed to "not inconsistent," with being molested and it fails to tell the jury that CSAAS evidence may not be used to determine whether a victim's molestation claim is true.

The People argue defendant has forfeited his instructional errors because he did not object at trial. Alternatively, the People argue there was no prejudicial instructional error. First, the failure to give CALCRIM No. 303 was harmless because CALCRIM No. 1193 contains its own limiting language. Second, as recognized by other courts of appeal, CALCRIM No. 1193 is an appropriate instruction that does not tell jurors to consider CSAAS testimony as evidence of guilt. Third, CALCRIM No. 332 is not confusing when combined with CALCRIM No. 1193 because in part CALCRIM Nos. 332 and 1193 merely give the jury guidance on how to evaluate CSAAS evidence.

### B. Additional Background

The trial court and the parties conferred regarding jury instructions. Prior to conferring, the prosecutor requested the court give CALCRIM Nos. 332 and 1193, while defendant requested the court give CALCRIM Nos. 303 and 332. The court decided to give CALCRIM Nos. 332 and 1193, but after commenting that there was no limited evidence introduced, it declined to give CALCRIM No. 303. After identifying the instructions to be given, both the prosecutor and defense counsel stated that they agreed with those instructions, and no objections were made.

CALCRIM No. 332 (Instruction 332) as given to the jury in relevant part read:

> "A witness was allowed to testify as an expert and to give opinion. You must consider the opinion, but you are not required to accept it as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.

16.

"You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.

"An expert witness may be asked a hypothetical question. A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

CALCRIM No. 1193 (Instruction 1193) as given to the jury read:

"You have heard testimony from Dr. Christopherson regarding [CSAAS].

"[CSAAS] relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse.

"Dr. Christopherson's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged.

"You may consider this evidence only in deciding whether or not E.'s conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

*C.     Legal Standard*

Claims of instructional error are reviewed de novo. (*People v. Lewis* (2023) 14 Cal.5th 876, 900 (*Lewis*); *People v. Thomas* (2023) 14 Cal.5th 327, 382 (*Thomas*).) Thus, an " 'appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.' " (*Lewis*, *supra,* at p. 900; *People v. Mitchell* (2019) 7 Cal.5th 561, 579.) If a defendant contends that an instruction misstates the law, the reviewing court must view the challenged instruction " ' "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." ' " (*Lewis*, *supra,* at p. 900; *Mitchell*, *supra,* at p. 579.) " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's

instructions.' " (*Thomas*, *supra,* at p. 382.)  If reasonably possible to do so, reviewing courts interpret an instruction in a manner that supports the judgment, as opposed to defeating it.  (*People v. Mani* (2022) 74 Cal.App.5th 343, 377; *People v. Quinonez* (2020) 46 Cal.App.5th 457, 465.)  Depending on the nature of the error, harm from an instructional error will be assessed under either the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, or the probability of a more favorable outcome standard of *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Hendrix* (2022) 13 Cal. 5th 933, 942.)

> D.     *Analysis*

> 1.     <u>*Instruction 1193*</u>

Initially, because defendant contends that Instruction 1193 is an incorrect statement of law, he has not forfeited his claim of error.  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.)  Nevertheless, defendant's challenges to Instruction 1193 have been made to other Courts of Appeal and been consistently rejected.  We agree with our sister courts and are not persuaded by defendant's arguments.

First, we cannot agree that Instruction 1193 impermissibly allowed the jurors to consider CSAAS testimony as evidence of guilt by addressing a victim's credibility. Courts have recognized that a reasonable jury would understand that Instruction 1193 does two distinct things:  it allows the jury to view CSAAS testimony to conclude that a victim's behavior does not mean the victim lied about being abused, and it prohibits the jury from using CSAAS testimony to conclude that the victim was in fact molested.  (See *Page*, *supra*, 114 Cal.App.5th at p. 1030; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.)  Because these two aspects of Instruction 1193 "simply neutralize[] the victim's apparently self-impeaching behavior," "a juror who believes [the CSAAS expert's] testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show [the victim] had been molested."  (*Gonzales*, *supra*, at p. 504; see *Page*, *supra*, at p.

18.

1030.)  Therefore, Instruction 1193 did not impermissibly permit the jury to consider CSAAS testimony as evidence of defendant's guilt.  (*Page*, *supra*, at p. 1030; *People v. Ramirez, supra,* 98 Cal.App.5th at pp. 219–220; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176; *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474.)

Second, although prior authority (e.g. *People v. Housley* (1992) 6 Cal.App.4th 947, 959), as well as prior versions of Instruction 1193, provided that CSAAS evidence may demonstrate that a victim's reactions were "not inconsistent with having been molested," we cannot conclude that Instruction 1193's use of the phrase "consistent with" (instead of "not inconsistent with") is of any import.  "[C]onsistent with" and "not inconsistent with" mean the same thing.  "[C]onsistent with" merely eliminates a grammatical double negative.  (*Page*, *supra*, 114 Cal.App.5th at p. 1031.)

Third, contrary to defendant's arguments, Instruction 1193 did not permit the jury to conclude that E. must have been abused simply because her behavior was consistent with CSAAS.  As the Fourth District Court of Appeal has recently explained:

> " '[T]he last sentence of [Instruction 1193] contains a direction with specific and general aspects.  Specifically, the jury is to use the expert testimony to help ground its analysis of the consistency of the complaining witness's conduct (by using a more informed reference point).  The jury is then to use this "consistency" analysis in its general evaluation of the believability of the complaining witness's testimony. … Reasonable jurors would not understand the instruction to mean that if they find the characteristics of [CSAAS] to be satisfied, this indicates that the [victim] was necessarily telling the truth.' " (*Page*, *supra*, 114 Cal.App.5th at p. 1032.)

As a result, Instruction 1193 appropriately limits the use of CSAAS evidence without: (a) improperly allowing an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violating due process; or (c) misapplying the burden of proof.  (*Page*, *supra*, at pp. 1032–1033; *Lapenias*, *supra*, 67 Cal.App.5th at p. 175.)

19.

For these reasons, defendant has not demonstrated that Instruction 1193 was an inaccurate statement of law or an otherwise improper or prejudicial instruction.

### 2. *Giving Instruction 332 and Instruction 1193 Together*

#### a. *Forfeiture*

Instruction 332 correctly states the law with respect to assessing the testimony of an expert witness. (§ 1227b [requiring that a jury be instructed regarding how to assess expert testimony]; *People v. Felix* (2008) 160 Cal.App.4th 849, 859–860.) Further, as explained above, Instruction 1193 correctly states the law with respect to CSAAS testimony. Because Instructions 332 and 1193 are both correct statements of the law, it was incumbent upon defendant to seek a clarification or modification of these instructions to address any perceived confusion. (*People v. Geier* (2006) 41 Cal.4th 555, 579; *People v. Kimble* (1988) 44 Cal.3d 480, 503.) Because defendant made no objections and sought no clarifications or modifications regarding Instructions 332 and 1193, defendant has forfeited any error from giving the two instructions together. (*Geier*, *supra,* at p. 579; *Kimble*, *supra,* at p. 503.)

#### b. *No Confusion*

Alternatively, even if the defendant did not forfeit his challenges to giving Instructions 332 and 1193, we are not persuaded that the two instructions created any confusion.[5]

##### i. *Hypothetical Questions*

Defendant contends that Instruction 332 discusses hypothetical questions and directs the jury to determine whether the assumed facts or basis for a hypothetical question was true. We agree that Instruction 332 so informs the jury. Nevertheless, that portion of Instruction 332 was essentially surplusage because Dr. Christopherson was not

---

[5] We note that the directions for Instruction 1193 state that Instruction 332 is to be used when Instruction 1193 is given. The Instruction 1193 directions do not state that Instruction 332 should be modified in any way.

asked any hypothetical questions.  Indeed, defendant identifies no hypothetical questions (or questions tied to the specific facts of this case, for that matter) that were posed to Dr. Christopherson.  Instead, Dr. Christopherson was generally asked about CSAAS and the five behaviors recognized by CSAAS.  This is the proper scope of CSAAS testimony. (Cf. *People v. Turner*, *supra*, 10 Cal.5th at p. 821, fn. 20 [noting that expert may testify as to generally accepted principles within a profession]; *People v. Ramirez*, *supra*, 98 Cal.App.5th at pp. 214–215 [noting the limited nature of the CSAAS expert's testimony and the possible reactions of child sex abuse victims]; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171 [expert CSAAS testimony admitted when evidence suggested that four of the five CSAAS behaviors or myths would be implicated]; *Munch*, *supra*, 52 Cal.App.5th at p. 467 [CSAAS expert had no information about the facts of the case but testified as to characteristics of children who had been sexually abused]; *Patino*, *supra*, 26 Cal.App.4th at p. 1742 [expert testified regarding five behaviors of CSAAS].)  Defendant theorizes that if the jury concluded hypothetical questions were asked, those questions would necessarily assume facts that are close to the facts of this case.  However, since no hypothetical questions were asked, there is no basis to conclude the jury would think that hypothetical questions were asked or that the jury would examine assumed bases for any theoretical hypothetical questions.  (*Thomas*, *supra*, 14 Cal.5th at p. 382.)  In the absence of any hypothetical questions actually being asked of Dr. Christopherson, the jury would not apply Instruction 332's language regarding hypothetical questions.  (*Ibid.*; see also *Lewis*, *supra*, 14 Cal.5th at p. 900.)

       *ii.*  *Absence of "Opinion" from Instruction 1193*

  Defendant is correct that Instruction 332 uses the term "opinion," but Instruction 1193 does not.  However, simply because Instruction 1193 does not use the term "opinion" does not mean that there is confusion or a fatal inconsistency between Instruction 332 and Instruction 1193 or that the jury would not understand how to evaluate Dr. Christopherson's testimony.  To the contrary, we believe that a reasonable

jury would understand that Instructions 332 and 1193 complement each other. Specifically, Instruction 1193 informs the jury that CSAAS testimony is a specialized form of expert testimony that can only be considered for limited purposes, while Instruction 332 informs the jury that Dr. Christopherson's entire expert testimony is subject to specific considerations as part of the jury's process for determining how much weight to give his testimony and whether to accept or reject his testimony in whole or in part. We detect nothing about the failure of Instruction 1193 to mention the term "opinion" that would confuse the jury or prejudice the defendant.[6] Therefore, defendant has not shown that the jury would be confused by Instruction 1193 or apply it in a prejudicial manner. (*Lewis*, *supra*, 14 Cal.5th at p. 900.)

### iii. Basis for CSAAS Testimony

Defendant argues that Instruction 332 required the jury to decide whether the information upon which Dr. Christopherson relied was true and accurate, but Dr. Christopherson did not offer any evidence by which the jury could conclude whether the factual basis of CSAAS had been proven. We are not convinced.

Expert testimony regarding CSAAS is not admitted for the purpose of *proving* CSAAS or explaining how CSAAS has been proven in the relevant field, rather it is admitted to help juries assess the credibility of child sexual abuse victims *in light of* CSAAS. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 172.) As such, Dr. Christopherson was not required to "prove" CSAAS, rather, it was sufficient for him to explain CSAAS in general and the five behaviors of CSAAS in particular. Such testimony has been repeatedly held to be admissible. (*People v. Ramirez*, *supra*, 98 Cal.App.5th at pp. 214–

---

[6] We note the trial court gave the jury CALCRIM Nos. 103 and 220, which properly informed the jury to consider all of the evidence received during trial. Because all of Dr. Christopherson's testimony, including his opinions, was received as "evidence," the jury would consider all of Dr. Christopherson's testimony irrespective of Instruction 332 or its use of the term "opinion." (*Thomas*, *supra*, 14 Cal.5th at p. 382.)

215; *Lapenias*, *supra*, at p. 171; *Munch*, *supra*, 52 Cal.App.5th at p. 467; *Patino*, *supra*, 26 Cal.App.4th at p. 1742). This is in part because expert witnesses may inform the jury about background information that is generally accepted and reasonably relied on in their field. (*People v. Turner*, *supra*, 10 Cal.5th at p. 821, fn. 20.) It is the general nature of a CSAAS expert's testimony that permits the jury to understand and assess the credibility of an alleged child sexual abuse victim by dispelling common myths and misconceptions. (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1301; *Munch*, *supra*, at p. 468.)

Here, through Instruction 332, the jury was directed to consider whether Dr. Christopherson had adequately explained the basis of CSAAS sufficiently for them to consider and apply it to this case. To the extent the jury was unsatisfied with Dr. Christopherson's explanations, including with respect to the origins or acceptance of CSAAS, Instruction 332 permitted the jury to reject some or all of his testimony. Given the nature of CSAAS testimony and the language of Instruction 332, defendant has not shown a reasonable likelihood that the jury misapplied Instruction 332 in a prejudicial way (*Lewis*, *supra*, 14 Cal.5th at p. 900), and we cannot conclude that a jury would be confused by not knowing how CSAAS had been "proven."

### 3. *CALCRIM No. 303*

CALCRIM No. 303 reads: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." The trial court did not give CALCRIM No. 303 apparently because it concluded that no evidence was admitted for a limited purpose. Defendant had requested CALCRIM No. 303 be given, but did not explain to the court that Dr. Christopherson's CSAAS testimony was admitted for a limited purpose (*Flores*, *supra*, 101 Cal.App.5th at pp. 455–456 [noting the limited purpose of CSAAS evidence]) or object when the court stated that it would not give CALCRIM No. 303.

Assuming without deciding that defendant did not forfeit this issue, the court's failure to give CALCRIM No. 303 was harmless. It is true that the bench notes for

23.

Instruction 1193 state that if the instruction is given, CALCRIM No. 303 should also be given. However, Instruction 1193 already informed the jury that there was a limitation on how to consider the CSAAS evidence. Instruction 1193 instructed the jury to consider CSAAS evidence "only in deciding whether or not [E.]'s conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of [the victim.]" The word "only" is a term of limitation and exclusivity. (*Machado v. Southern Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 357–358; *Johnson v. Ocean Shore Railroad Co.* (1971) 16 Cal.App.3d 429, 434; Black's Law Dict. (6th ed. 1990) p. 1089, col. 1 [definition of "only"].) By directing the jury to "only" consider CSAAS for two purposes (believability and conduct consistent with CSAAS), Instruction 1193 of necessity informed the jury that they could consider CSAAS for no other purposes. We presume that the jury understood the meaning of Instruction 1193, the import of the word "only," and that they followed Instruction 1193 by only considering CSAAS evidence for the limited purposes described. (*Thomas*, *supra*, 14 Cal.5th at p. 382.) There is nothing before us to rebut these presumptions. Therefore, because we presume that the jury correctly followed the limitations in Instruction 1193, and because the express limitation within Instruction 1193 has the same limiting effect as CALCRIM No. 303, the failure to give CALCRIM No. 303 was harmless under any standard.

III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel's conduct with respect to the CSAAS testimony and the CSAAS related jury instructions were prejudicially ineffective.

In order for defense counsel's conduct to be deemed constitutionally ineffective, the defendant must show both a deficient performance and prejudice. (*People v. Aguirre* (2025) 18 Cal.5th 629, 706.) Defendant cannot meet these requirements. First, as explained above, we have determined that Dr. Christopherson's testimony was relevant and properly admitted and that the trial court properly gave Instructions 332 and 1193. Therefore, defense counsel had no bases for objections and was not deficient with respect

24.

to these alleged errors.  Second, we have determined that the failure to give CALCRIM No. 303 was harmless.  Therefore, defendant could not have been prejudiced by his counsel's failure to request CALCRIM No. 303.  For these reasons, defendant has failed to establish constitutionally ineffective assistance of counsel.

## IV.    SUFFICIENCY OF THE EVIDENCE TO SUPPORT COUNT 1

### A.    Parties' Arguments

Defendant argues there is no evidence that the count 1 offense occurred during the time period charged.  Defendant argues that E. had no recollection of the count 1 offense, and the MDIC did not establish a definite time when the abuse occurred because E. said she thought the abuse began between ages four or five, likely when she was in preschool, and after her brother had been born.  Defendant points out that E. was six when her brother was born, and that the prosecutor amended the information to specifically allege that the abuse in count 1 occurred between August 1, 2007, and June 30, 2012.  However, based on the MDIC interview, the abuse could have occurred in January 2007, when E. turned four, and the seven-month gap between January 2007 and August 2007 is materially outside of the time range alleged in count 1.  Defendant argues it is absolute speculation that E. was abused on or after August 1, 2007.

The People contend that the MDIC interview constitutes substantial evidence and supports the count 1 conviction.  The People also argue that the date that count 1 occurred need not be proved with exactness and that there were no material discrepancies between any relevant dates.

### B.    Legal Standard

In assessing the sufficiency of the evidence to support a conviction, reviewing courts " ' " ' "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' " (*People v. Oyler* (2025) 17 Cal.5th 756, 820.)

" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Appellate courts presume in support of the judgment every fact that the trier of fact could reasonably deduce from the evidence. (*Oyler, supra,* at p. 820.) Appellate courts do not resolve credibility issues or evidentiary conflicts. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) A judgment will not be reversed for insufficiency of the evidence merely because the circumstances may also be reasonably reconciled with a conclusion contrary to the judgment. (*Oyler, supra,* at p. 820.)

C.    *Additional Background*

Pertinent to count 1, the trial court gave the jury CALCRIM Nos. 207 and 1127.

CALCRIM No. 207 informed the jury as follows: "It is alleged that the crimes occurred on or about August 1, 2007 through June 30, 2012. The People are not required to prove that the crimes to place exactly on those days but only that they happened reasonably close to those days."

CALCRIM No. 1127 identified the elements of a section 288.7, subdivision (a) offense. Apart from the elements of the offense, this instruction informed the jury that the "defendant is charged in Count One with engaging in sodomy with a child 10 years of age or younger in violation of Penal Code section 288.7(a). (First time in the city of Reedley, when the victim was four or five years old)."

D.    *Analysis*

As noted above, the count 1 offense is based on the first act of sodomy that was performed against E. by defendant. Count 1 was alleged to have occurred in Reedley when E. was either four or five years old. There is no doubt that E.'s trial testimony was

26.

insufficient to support a conviction on count 1 because she had absolutely no recollection of any abuse occurring in Reedley.

Notwithstanding E.'s trial testimony, the jury also viewed E.'s MDIC interview. In the MDIC interview, E. told the interviewer that defendant pulled her pants down, placed his penis in her "butt," and moved up and down without letting her get up. E. also told the interviewer that this act of sodomy occurred in Reedley when she was either four or five years old and she *thought* she was in preschool and *thought* that her brother had been born but he was still a baby. E.'s statements in the MDIC interview are direct evidence that establishes each element of the section 288.7, subdivision (a) violation charged in count 1, including that she was four or five years old (and thus, under 10 years old), and the abuse occurred in Reedley. Therefore, E.'s MDIC interview by itself constitutes substantial evidence that supports the count 1 conviction. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281; see *People v. Oyler*, *supra*, 17 Cal.5th at p. 820.)

Defendant contends there is insufficient evidence to show that E. was abused in Reedley between August 1, 2007, and June 30, 2012. However, the general rule is that the prosecution "need not plead the exact time of commission of an alleged offense." (*People v. Richardson* (2008) 43 Cal.4th 959, 1027; see § 955.) If the prosecution opts to allege specific dates or time periods, it has long been established that the prosecution does not need to actually prove the alleged date(s) with exactness so long as the prosecution shows the offense took place before the filing of the information and within the limitations period, unless time is somehow a material element in the case or the defendant was misled in his defense. (See *People v. Lees* (1967) 257 Cal.App.2d 363, 369; *People v. Krupnick* (1958) 165 Cal.App.2d 755, 764; *People v. Roebling* (1936) 14 Cal.App.2d 586, 589.) Here, defendant has not shown that time itself was a material element of the offense, he did not pursue an alibi defense, he has not argued or shown that the alleged conduct in Reedley occurred outside of any limitations period, he has not demonstrated how a distinction between January 2007 (the month and year of E.'s fourth

27.

birthday) and August 1, 2007 is material, and he has not argued or demonstrated that he was in any way misled in making his defense based on the timeframes alleged in the information. (*Lees*, *supra*, at p. 369; *Krupnick*, *supra*, at p. 764.) Therefore, the failure of the prosecutor to prove an exact date within the timeframe alleged in the information for count 1 is of no consequence. (*Lees*, *supra*, at p. 369; *Krupnick*, *supra*, at p. 764.)

In sum, sufficient evidence supports defendant's conviction on count 1.

## V. CUSTODY AND CONDUCT CREDITS

### A. Parties' Arguments

Defendant argues that there was a miscalculation as to his custody and conduct credits. Defendant contends that he is entitled to three additional days of custody credits and one additional day of section 2933.1 conduct credit.

The People agree there was a miscalculation and that defendant is entitled to three additional days of custody credit. However, because conduct credits under section 2933.1 are subject to a 15 percent limitation, the People argue that defendant is not entitled to any additional conduct credits.

### B. Analysis

We agree with the parties that, based on an arrest date of October 9, 2020, and a sentencing date of August 13, 2024, defendant is entitled to 1,405 days of custody credit. Because defendant was awarded 1,402 days of custody credit, he is entitled to an additional three days of custody credit.

With respect to conduct credits, section 2933.1, subdivision (c) limits the amount of presentence credits to 15 percent of the actual period of presentence confinement for those who are convicted of a violent felony, as defined by section 667.5, subdivision (c). (§ 2933.1, subd. (c); *People v. Duff* (2010) 50 Cal.4th 787, 794; *People v. Jones* (2009) 47 Cal.4th 566, 576.) Defendant's convictions under section 288.7, subdivision (a) are violent felonies under section 667.5, subdivision (c)(7) (convictions for offenses punished by death or life imprisonment), and defendant's conviction under section 288,

28.

subdivision (a) is a violent felony under section 667.5, subdivision (c)(6) (convictions under § 288, subds. (a) and (b)).  Therefore, all of defendant's convictions are for violent felonies, and the amount of presentence conduct credits that defendant may be awarded is capped by section 2933.1, subdivision (c) to 15 percent of 1,405 days.  Fifteen percent of 1,405 days is 210.75 days.  Because 211 days of conduct credit would exceed 15 percent, and because defendant may not be awarded partial days, the trial court correctly awarded defendant 210 days of conduct credit.  (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1184; *People v. Ramos* (1996) 50 Cal.App.4th 810, 815–816.)

### DISPOSITION

The judgment is affirmed.  This matter is remanded back to the trial court in order to prepare an amended abstract of judgment that awards defendant 1,405 days of custody credits.


FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.